IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**ALAN WARMBIER,**

    Plaintiff,

v.

Case No.

**OMEGA WATER SCIENCES, LLC,**
a Florida Limited Liability Company,
**OMEGA MATERIAL SCIENCES, LLC,**
a Florida Limited Liability Company,
**OMEGA PETROLEUM SCIENCES,
LLC,** a Florida Limited Liability
Company, **KEITH ERVIN, GLEN
FINKEL, JAMES DOUCHER, and
STEVEN S. SHERMAN d/b/a PROJECT
VISION DYNAMICS,**

JURY TRIAL DEMANDED

    Defendants.
_____/

## COMPLAINT

Plaintiff Alan Warmbier ("Warmbier" or "Plaintiff"), by and through undersigned counsel, brings this Complaint against Defendants Omega Water Sciences, LLC ("Omega Water"), Omega Material Sciences, LLC ("Omega Material"), Omega Petroleum Sciences, LLC ("Omega Petroleum")(Omega Water, Omega Material, and Omega Petroleum shall collectively be referred to as "the Companies"), Keith Ervin ("Ervin"), Glen Finkel ("Finkel"), James Doucher ("Doucher"), and Steven S. Sherman d/b/a Project Vision Dynamics ("Sherman" or "Project Vision Dynamics")(Ervin, Finkel, Doucher, Sherman/Project Vision Dynamics, and the Companies shall collectively be referred to as "the Defendants"), and states as follows:

## JURISDICTION

1. Plaintiff Warmbier is an individual 18 years of age or older and is thus *sui juris*.

2. Warmbier currently resides in Hillsborough County, Florida, and did at all times relevant to the allegations herein reside in Hillsborough County, Florida.

3. The Defendant Companies are Florida limited liability companies that primarily operate out of the same building located at 901 W. Dr. Martin Luther King Jr. Boulevard, Plant City, Florida 33563.

4. Defendant Ervin is an individual 18 years of age or older and is thus *sui juris*.

5. Defendant Finkel is an individual 18 years of age or older and is thus *sui juris*.

6. Defendant Doucher is an individual 18 years of age or older and is thus *sui juris*.

7. Defendant Sherman is an individual 18 years of age or older and is thus *sui juris*.

8. At the time of the allegations in this Complaint, Sherman was registered as "doing business as" Project Vision Dynamics with the State of Florida, but Project Vision Dynamics was not and is not currently incorporated or otherwise organized as a business entity.

9. This Court has original jurisdiction over the federal claims raised herein pursuant to 28 U.S.C. § 1331.

10. This Court also has supplemental jurisdiction over the state claims raised herein pursuant to 28 U.S.C. § 1367 because those claims arise from the same common core of operative facts as the federal claims.

11. Venue is proper in the United States District Court, Middle District of Florida, pursuant to 28 U.S.C. § 1391(b)(2) as the events or transactions out of which this claim arose occurred in Hillsborough County, which is located within the Middle District of Florida.

12. Thus, the Tampa Division is the proper division. M.D. Fla. Loc. R. 1.02(b)(4).

## THE COMPANIES AND PROJECT VISION DYNAMICS ARE AN INTEGRATED ENTERPRISE

13. The economic realities of the operations of the Companies and Project Vision Dynamics as applies to Warmbier's employment support a single employer/integrated enterprise relationship.

14. The Defendant Companies and Project Vision Dynamics are highly integrated as to ownership and operations.

15. To wit: the Companies and Project Vision Dynamics share the same physical address for their principal place of business, which is a building believed to be owned by Sherman.

16. The Companies also market their services on the internet through the website address "www.omegasciences.com" which is an umbrella website for the services rendered by Omega Water and Omega Petroleum, whose information is directly accessible through the "www.omegasciences.com" website.

17. Furthermore, Omega Water and Omega Petroleum share the same four managing members: Sherman, Ervin, Finkel, and Doucher; while Ervin is the sole managing member of Omega Material.

18. Omega Water, Omega Petroleum, and Sherman d/b/a Project Vision Dynamics list their addresses as 901 West Dr. Martin Luther King, Jr. Boulevard in Plant City, Florida.

## GENERAL ALLEGATIONS

19. In 2018, Warmbier was a member of the armed services, specifically, the Army.

20. In October of 2018, Sherman contacted Warmbier to discuss working at a new company he had started, Defendant Omega Water.

21. Sherman offered Warmbier the position of Chief Operating Officer ("COO") as well as an opportunity to purchase a five percent (5%) interest in Omega Water, all of which was memorialized in an offer letter. (Exh. A.)

22. Warmbier trusted Sherman's representations.

23. Accordingly, in reliance on Sherman's representations that Omega Water was a stable company that was sufficiently financially-backed, Warmbier accepted the offer on October 29, 2018.

24. Omega Water was organized as limited liability company under Florida law on October 31, 2018.

25. Warmbier then began the process of retiring from the Army.

26. Warmbier's early and unplanned retirement from the Army meant that he passed up promotional and educational opportunities, as well as civilian transition assistance, all of which would have been available to him had he remained in the Army as he had planned.

27. Warmbier officially retired from the military effective June 1, 2019.

28. On or about February 9, 2019, Warmbier completed the purchase of the 5% ownership interest into Omega Water.

29. Warmbier began full-time employment at Omega Water on or about March 1, 2019.

30. In July 2019, Warmbier was informed by Sherman that Omega Water had "run out of money" and it would be unable to pay him and others.

31. Warmbier's paycheck for August 9, 2019 was direct deposited and subsequently withdrawn from Warmbier's account on August 13, 2019.

32. This was the first time Warmbier was notified of a complete lack of funds despite being a company executive and part owner.

33. Upon information and belief, Omega Water had also spent the money that was previously withheld from Warmbier and other employees' paychecks for Federal Income Tax and Social Security.

34. Over the next two months, Warmbier was continuously assured that investment money would be arriving and, in reliance on that, he continued to work for another two months without pay.

35. Sherman and Ervin told me they were continuing to work on potential

investment sources.

36. However, when those initial efforts failed, they began looking at other technologies that might attract investors.

37. As a result, Sherman and Ervin asked Warmbier to type up two memoranda, one of which was for Defendant Omega Petroleum and one was for another entity called "Omega Air Sciences."

38. "Omega Air Sciences" has not be incorporated or otherwise organized as an entity with the State of Florida.

39. Rather, "Omega Air Services" ("Omega Air") is an unregistered fictitious name used by the individually-named Defendants Ervin, Finkel, Doucher, and Sherman to conduct business.

40. Sherman and Ervin informed me that they planned on selling shares of Omega Petroleum and Omega Air which had not previously existed, for the purpose of generating more capital to run Omega Water.

41. In short, Omega Petroleum and Omega Air were created for the sole purpose of generating additional capital for Omega Water while using the same or similar technology as Omega Water.

42. On four occasions, Sherman or Ervin either separately or jointly assured Warmbier that he and the other investors would be compensated with 5% ownership of Omega Petroleum and Omega Air.

43. On Thursday, September 19, 2019, Warmbier raised concerns with the performance of key aspects of Omega Water, Omega Petroleum, and Omega Air, along

with legal and ethical concerns about misleading potential investors regarding the progress toward achieving the desired test results.

44. The conversation centered around the most recent effort to procure investor funding for transforming poor-quality "sour" crude oil into high- quality "sweet" crude.

45. During Warmbier's eight-month tenure, there had been no testing on crude oil of any kind and the Defendants were asking investors for $2-3 million based on "successful laboratory results," which had not been attained.

46. Additionally, Warmbier raised concerns about the non-payment of workers and the hiring of additional staff with the knowledge the Defendants could not pay them.

47. Warmbier stated that continuing to have the employees work indefinitely was at the very least unethical and possibly against labor laws.

48. Warmbier also questioned why the Defendants had misrepresented the amount and availability of investment funding to me in the first place.

49. Lastly, Warmbier raised serious safety concerns related to hydrogen sulfide and methane gases that may be released during experimentation with the new technologies in the petroleum and air sectors.

50. Ervin had positioned a bioreactor filled with dozens of varieties of bacteria and fungi near the air conditioning intake.

51. The bioreactor also produces both highly toxic and flammable gases and Warmbier could smell them leaking from container.

52. Warmbier believed these to be violations of the Occupational Safety and

Health Act's ("OSHA") general duties clause, at minimum.

53. In response to Warmbier's concerns, Sherman told Warmbier that he needed to "be more positive," "have a blue-sky attitude," and "needed to just hope" that Ervin could figure out the technical issues the Defendants were having.

54. Warmbier was also uninvited to a presentation for potential investors over the weekend.

55. On Monday, September 23, 2019, Warmbier was fired within five minutes of arriving in the morning.

56. Warmbier was told that he did not have a "positive enough attitude" and did not "believe enough" in the technology, even though he had never been counseled for poor performance or other employment issues.

57. In fact, prior to Warmbier objecting to the Defendants' conduct in the week leading up to his termination, Sherman had praised Warmbier for performing "above expectations" and assured Warmbier he would be compensated accordingly.

58. As a result of the Defendants' unlawful conduct, Warmbier has had to retain the services of the undersigned, to whom he is obligated to remit attorneys' fees and costs.

## COUNT I (BREACH OF CONTRACT)

59. Warmbier reaffirms and realleges paragraphs 1-58, above.

60. On October 27, 2018, Sherman presented Warmbier with an offer of employment with Omega Water and Omega Material.

61. The terms of the offer were encompassed in a letter on Omega Materials

letterhead, dated October 27, 2018, with Sherman's name in the signature block as the "Chief Operating Officer." (Exh. A.)

62. The offer letter contained all the essential terms of Warmbier's employment with Omega Water and Omega Material. (*Id.*)

63. Warmbier signed the offer letter indicating his acceptance of the agreement on October 29, 2018, after which he returned it to Sherman. (*Id.*)

64. The offer letter constituted a contract within the meaning of Florida law.

65. Sherman and the Companies breached the terms of the contract by:

   a. Failing to compensate Warmbier, as provided in the contract; and

   b. Failing to provide Warmbier with benefits, as provided in the contract.

66. The breaches by Sherman and the Companies have caused Warmbier financial harm.

67. Because Omega Water was not organized as a limited liability company at the time Warmbier entered into the contract, the individual members of Omega Water, including Ervin, Finkel, Doucher, and Sherman, are personally liable to Warmbier for the breaches of contract.

68. Furthermore, because the contract also identifies Omega Material as an employer of Warmbier and the Companies were an integrated enterprise, all of the Companies are liable for the breaches of contract.

WHEREFORE, Warmbier demands that the Court enter joint and several judgment against all of the Defendants for the following:

   a. The value of lost compensation and benefits due to Sherman and the

        Companies' breach of the agreement;

b.    Attorneys' fees and costs consistent with section 448.08, *Florida Statutes*;

c.    Nominal damages;

d.    Interest on any amount awarded; and

e.    Any other relief the Court deems just and proper.

### COUNT II (FRAUD IN THE INDUCEMENT)

69.    Warmbier reaffirms and realleges paragraphs 1-58 and 60-63, above.

70.    The offer letter outlined that Omega Water had initial investment capital in excess of $500 million, and had sufficient financial backing, which were false statements of material fact. (Exh. A.)

71.    Sherman knew or should have known that the statements were false at the time he made it.

72.    Sherman made the false statement to induce Warmbier to retire earlier than he had planned on retiring from the military to come and work for Omega Water.

73.    Warmbier's reliance on Sherman's false statements of material fact caused injury to Warmbier, in that Warmbier lost wages and benefits that he would have received had he not retired from the military June 1, 2019.

74.    Warmbier's reliance on Sherman's false statements of material fact also caused injury to Warmbier because he invested money in Omega Water which he has yet to recover.

75.    Because Omega Water was not organized as a limited liability company

at the time Warmbier was fraudulently induced to work for the Companies, the individual members of Omega Water, including Ervin, Finkel, Doucher, and Sherman, are personally liable to Warmbier for the resulting damages.

76. Furthermore, because the inducement was made by Sherman, who was a member with actual or apparent authority to make statements for on behalf of Omega Materials, who is listed on the offer letter, and the Companies were an integrated enterprise, all of the Companies are liable for the resulting damages.

77. Warmbier's reliance on Sherman's false statements of material fact have caused Warmbier to suffer emotional pain and loss of the capacity to enjoy life.

78. As a direct and proximate result of Sherman and the Companies' false statements, Warmbier has suffered, is suffering, and will continue to suffer financial and emotional damages into the indefinite future.

WHEREFORE Warmbier demands that the Court enter joint and several judgment against all the Defendants for the following:

  a. The lost value of Warmbier's military pay and benefits that he would have received had he not retired early;

  b. Compensatory damages, including, but not limited to compensation for past, present, and future mental anguish;

  c. Interest on any amount awarded;

  d. Nominal damages;

  e. Punitive damages; and

  f. Any other relief the Court deems just and proper.

## COUNT III (QUANTUM MERUIT)

79. Warmbier reaffirms and realleges paragraphs 1-58, above.

80. This Count is pled in the alternative to Count I and to the extent the offer letter is deemed not to constitute a contract within the meaning of Florida law.

81. The Defendants were aware that Warmbier was providing services to the Companies and acquiesced to his provision of those services.

82. The Defendants were aware that Warmbier expected to be compensated for those services as described in the offer letter.

83. The Defendants were unjustly enriched by the services that Warmbier provided.

WHEREFORE Warmbier demands that the Court enter joint and several judgment against the Companies and Sherman for the following:

    a. Compensation for the services Warmbier provided under the terms described in the offer letter;

    b. Attorneys' fees and costs consistent with section 448.08, *Florida Statutes*;

    c. Interest on any amount awarded;

    d. Nominal damages; and

    e. Any other relief the Court deems just and proper.

## COUNT IV (VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938, AS AMENDED)

84. Warmbier reaffirms and realleges paragraphs 1-58, above.

85. The Companies, which acted as an integrated enterprise as to Warmbier, are covered employer(s) within the meaning of the Fair Labor Standards Act of 1938, as amended ("FLSA").

86. Upon information and belief, the Companies had, at all relevant times, sales in excess of $500,000 per year and employed two or more individuals.

87. Warmbier performed work for the Companies during the summer and fall of 2019 without compensation.

88. Thus, the Companies violated the FLSA by failing to compensate Warmbier for any and all hours worked at the federal minimum wage and/or for overtime worked at the proper regular rate of pay for each week that he worked in excess of 40 hours per week.

89. Furthermore, Ervin, Finkel, Doucher, and Sherman are individually liable for the wage violations because they exercised control over the day-to-day operations of the Companies and Warmbier's pay.

90. The Defendants' violation of the FLSA was willful, as evidenced by the Defendants' deposit of wages to Warmbier's bank account and then the knowing retraction of those funds, as well as a result of Warmbier's complaints of not being paid at all, which he believed to be a violation of "labor laws."

WHEREFORE Warmbier demands that the Court enter joint and several judgment against the Defendants for the following:

    a. Unpaid minimum wages for all hours Warmbier worked without pay;

    b. Unpaid overtime wages for all hours Warmbier worked in excess of

    40 hours in a workweek without being compensated at one and a half times his regular rate of pay;

 c. Liquidated damages on the amounts awarded in subsections (a) and (b), *supra*;

 d. An injunction prohibiting the Defendants from engaging in further wage violations;

 e. Interest on any amounts awarded;

 f. Attorneys' fees and costs; and

 g. Any other relief the Court deems just and proper.

**COUNT V (VIOLATION OF THE FLSA'S ANTI-RETALIATION PROVISION)**

91. Warmbier reaffirms and realleges paragraphs 1-58, 77-78, and 89, above.

92. In August 2019, Warmbier objected to the Defendants' failure to pay him and other employees consistent with the law, which was protected activity within the meaning of the FLSA's anti-retaliation provision.

93. On September 23, 2019, the Defendants terminated Warmbier's employment.

94. Warmbier's protected activity was a substantial or motivating factor in the Defendants' decision to terminate Warmbier's employment.

95. Thus, the Defendants violated the FLSA's anti-retaliation provision.

WHEREFORE Warmbier demands that the Court enter joint and several judgment against the Defendants for the following:

 a. Backpay, including lost wages and benefits to the date of trial;

      b.      Reinstatement or front pay;

      c.      Compensatory damages, including, but not limited to compensation for past, present, and future mental anguish;

      d.      Interest on any amount awarded;

      e.      An injunction prohibiting the Defendants from engaging in further wage violations;

      f.      Nominal damages; and

      g.      Any other relief the Court deems just and proper.

### COUNT VI (VIOLATION OF THE FLORIDA CONSTITUTION AND MINIMUM WAGE LAW)

96.    Warmbier reaffirms and realleges paragraphs 1-58, above.

97.    Warmbier performed work for the Companies during the summer and fall of 2019 without compensation.

98.    Thus, the Companies violated the Florida Constitution (Fla. Constit. art. X, § 24(c)) and the Florida minimum wage law (Fla. Stat. § 448.110) by failing to compensate Warmbier for any and all hours worked at the applicable Florida minimum wage.

99.    Furthermore, Ervin, Finkel, Doucher, and Sherman are individually liable for the Companies' failure to pay Warmbier the appropriate minimum wage under Florida law because they exercised control over the day-to-day operations of the Companies and Warmbier's pay.

100.    The Defendants' violation of the Florida minimum wage requirements was willful, as evidenced by the Defendants' deposit of wages to Warmbier's bank account and

then the knowing retraction of those funds, as well as a result of Warmbier's complaints of not being paid at all, which he believed to be a violation of "labor laws."

WHEREFORE Warmbier demands that the Court enter joint and several judgment against the Defendants for the following:

    a.    Unpaid minimum wages for all hours Warmbier worked without pay;

    b.    Liquidated damages;

    c.    Interest on any amounts awarded;

    d.    An injunction prohibiting the Defendants from continued wage violations;

    e.    Attorneys' fees and costs pursuant to section 448.08, *Florida Statutes*; and

    f.    Any other relief the Court deems just and proper.

### COUNT VII (VIOLATION OF FLORIDA'S WAGE LAW'S ANTI-RETALIATION PROVISION)

101.    Warmbier reaffirms and realleges paragraphs 1-58, 77-78, and 89, above.

102.    In August 2019, Warmbier objected to the Defendants' failure to pay him and other employees consistent with the law, which was protected activity within the meaning of Florida's wage law's anti-retaliation provision. Fla. Stat. § 448.110(5).

103.    On September 23, 2019, the Defendants terminated Warmbier's employment.

104.    Warmbier's protected activity was a substantial or motivating factor in the Defendants' decision to terminate Warmbier's employment.

105. Thus, the Defendants violated Florida's wage laws' anti-retaliation provision.

WHEREFORE Warmbier demands that the Court enter joint and several judgment against the Defendants for the following:

    a. Backpay, including lost wages and benefits to the date of trial;

    b. Reinstatement or front pay;

    c. Compensatory damages, including, but not limited to compensation for past, present, and future mental anguish;

    d. Interest on any amount awarded;

    e. An injunction prohibiting the Defendants from engaging in further wage violations;

    f. Nominal damages; and

    g. Any other relief the Court deems just and proper.

## COUNT IV (FLORIDA WHISTLEBLOWER'S ACT RETALIATION)

106. Warmbier reaffirms and realleges paragraphs 1-55, 77-78, and 89, above.

107. The Companies and Sherman constituted a covered employer within the meaning of section 448.101(3), *Florida Statutes*, as they jointly employed ten or more persons at all relevant times.

108. Warmbier performed work for the Companies and Sherman, and he was therefore a covered employee of the Companies and Sherman within the meaning of section 448.101(2), *Florida Statutes*.

109. In August and September of 2019, Warmbier objected to the activities and practices of the Companies and Sherman which were violations of law, rule, or regulation.

110. In particular, Warmbier objected to the Companies and Sherman violating the OSHA's general duties clause and the state and federal wage laws.

111. The Companies and Sherman took an adverse personnel action against Warmbier by terminating his employment with them.

112. Warmbier's objections to the Companies' and Sherman's unlawful actions were substantial or motivating factors causing Warmbier's termination.

WHEREFORE Warmbier demands that the Court enter joint and several judgment against the Companies and Sherman for the following:

    a.    Backpay, including lost wages and benefits to the date of trial;

    b.    Reinstatement or front pay;

    c.    Compensatory damages, including, but not limited to compensation for past, present, and future mental anguish;

    d.    Interest on any amount awarded;

    e.    An injunction prohibiting the Defendants from engaging in further wage violations;

    f.    Nominal damages; and

    g.    Any other relief the Court deems just and proper.

### COUNT V (BREACH OF OPERATING AGREEMENT)

113. Warmbier reaffirms and realleges paragraphs 1-55, above.

114. Warmbier, Ervin, Sherman, and Finkel entered into an agreement for the purpose of conducting the business of Omega Water (the "Operating Agreement"). (Exh. B.)

115. Pursuant to the Operating Agreement, Warmbier paid for his portion of the ownership interest in Omega Water.

116. Ervin, Sherman, Finkel, and Omega Water breached the Operating Agreement by failing to pay Warmbier consistently with the Operating Agreement, including, but not limited to failing to pay him for his investment in Omega Water.

117. Ervin, Sherman, and Finkel also personally benefitted from Omega Water's breach of the Operating Agreement.

118. Omega Water, Ervin, Sherman, and Finkel breached the duties of loyalty to Warmbier under chapter 605, *Florida Statutes*.

WHEREFORE Warmbier demands that the Court enter joint and several judgment against Omega Water, Ervin, Sherman, and Finkel for the following:

    a. An Order requiring Omega Water, Ervin, Sherman, and Finkel to provide Warmbier with an accounting;

    b. Payment of any and all funds due to Warmbier as a member of Omega Water;

    c. Interest on any amount awarded;

    d. Nominal damages; and

    e. Any other relief the Court deems just and proper.

## JURY TRIAL DEMAND

The Plaintiff demands a jury trial on all issues so triable.

Respectfully submitted this 24th day of July, 2020.

                                                  */s/ Shaina Thorpe*
                                                  **SHAINA THORPE**
                                                  Florida Bar No. 0055464
                                                  Primary: shaina@thorpelaw.net
                                                  Secondary: angel@thorpelaw.net

                                                  **THORPELAW, P.A.**
                                                  1228 East 7th Ave., Ste. 200
                                                  Tampa, Florida 33605
                                                  Telephone: (813) 400-0229
                                                  Fax: (813) 944-5223

                                                  *Counsel for Plaintiff Alan Warmbier*